IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs April 3, 2017

**IN RE TRAVIS H.**

**Appeal from the Juvenile Court for Jefferson County**
**No. 16-00424        Dennis Roach, II, Judge**

_____

**No. E2016-02250-COA-R3-PT**
_____

Father appeals the termination of his parental rights on grounds of: (1) failure to substantially comply with permanency plans; (2) abandonment by failure to establish a suitable home; (3) persistence of conditions, (4) abandonment by an incarcerated parent for wanton disregard; and (5) abandonment by an incarcerated parent for willful failure to support. We vacate the trial court's determination regarding the ground of abandonment by an incarcerated parent for willful failure to support, but otherwise affirm the trial court's determinations regarding the remaining grounds for termination. We likewise affirm the trial court's determination that termination of Father's parental rights is in the child's best interest. Accordingly, we affirm the termination of Father's parental rights.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Vacated in Part and Affirmed in Part**

J. STEVEN STAFFORD, P.J.,W.S., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and ANDY D. BENNETT, J., joined.

Daniel Hellman, Knoxville, Tennessee, for the appellant, Travis H.

Herbert H. Slatery, III, Attorney General and Reporter; Jordan K. Crews, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

James D. Hutchins, Dandridge, Tennessee, Guardian ad Litem.

**OPINION**

**Background**

The child at issue in this appeal was born in October 2013 to unmarried parents Travis H. ("Father") and Bobbie S.S ("Mother").[1] On May 16, 2015, the child and his half-sister ("half-sister")[2] were removed from parents' home due to allegations of nutritional neglect, drug exposure, and environmental neglect. On July 1, 2015, Father signed the Criteria and Procedures for Termination of Parental Rights. On August 19, 2015, the juvenile court adjudicated the children dependent and neglected and they were placed in the custody of the Tennessee Department of Children's Services ("DCS").

DCS developed three permanency plans for the child, all of which were ratified by the trial court. The first plan, developed in June 2015, required that Father obtain and maintain appropriate drug-free housing for a period of three to four months, have stable income and pay child support, have a means of transportation or a plan for transportation, complete parenting classes, obtain mental health and alcohol and drug assessments and follow all recommendations, and submit to random drug screens and pill counts. In addition, with regard to many of the requirements above, Father was required to submit proof that he had met these requirements to DCS. In the six months following the development of the plan, Father completed a mental health assessment and an alcohol and drug assessment. DCS alleges, however, that Father failed to follow the recommendations that resulted from the assessments or otherwise complete any of the plan's additional requirements. The second plan, developed in September 2015, added only one additional requirement—that Father follow the recommendations of his mental health assessment. A final plan was developed in March 2016. This plan changed the goal from reunification to adoption, but did not alter Father's responsibilities.

In January 2016, Father was arrested on three counts of theft and thirteen counts of fraudulent use of a credit card. Father was eventually sentenced to eleven months, twenty-nine days, of which he served forty-five days in confinement. After Father's release from confinement in February 2016, he was soon arrested on additional charges. First, Father was arrested in April 2016 for failure to pay child support. Father posted a $100.00 bond on this charge to secure his release. On or about May 3, 2016, Father was again arrested, this time for violating his probation. It appears from the record that Father was sentenced to thirty days with "two for ones." Father was again arrested in June 2016 for violating his probation and was sentenced to serve the remainder of his sentence. While incarcerated, Father was charged with an additional crime after he walked away from a work detail. It appears that Father was sentenced to serve sixty days consecutive for the crime of escape. Father also pleaded guilty to driving on a suspended license in July 2016. It appears Father was sentenced to six months incarceration for this crime, again consecutive to the violation of probation Father was serving at the time of the plea.

---

[1] In termination of parental rights cases, it is the policy of this Court to remove the names of minor children and other parties in order to protect their identities.

[2] The child and half-sister share the same mother but have different fathers.

In the meantime, on May 20, 2016, while Father was incarcerated, DCS filed a petition to terminate Father's parental rights on the grounds of: (1) failure to substantially comply with permanency plans; (2) abandonment by failure to establish a suitable home; (3) persistence of conditions, (4) abandonment by an incarcerated parent for wanton disregard; (5) abandonment by an incarcerated parent for willful failure to support; and (6) abandonment by an incarcerated parent for willful failure to visit.[3] DCS later withdrew its allegations concerning willful failure to visit. A trial occurred on September 14, 2016. At the time of trial, Father remained incarcerated and was expected to be released in March 2017.

Mother, Father, the half-sister's father, a DCS case worker, and the children's Foster Mother testified at trial. Because this appeal only involves Father, we will only discuss the testimony that is relevant to his appeal. Father testified that DCS had been previously involved with the family due to marijuana use. The family at that time had participated in DCS Services, but, soon after DCS ceased involvement with the family, drug use again became an issue. Father admitted that the children had been removed from his home in May 2015 but denied that their removal was the result of his drug use. There is no dispute that Mother and two other persons living in the home at the time of the removal tested positive for illegal drugs. A drug screen performed on May 12, 2015, also showed that Father was positive for "BUP."[4] Father testified, however, that he was prescribed Suboxone, a form of BUP, by a physician and that he only began taking the drug shortly after the removal of the children. According to Father, when he could no longer afford physician's visits, he purchased his Suboxone from "the street." Father also admitted that he tested positive for methamphetamine in August 2015 but claimed that he only used that drug once. Father likewise admitted to using marijuana when he was not incarcerated and that he had previously attended drug rehabilitation. A drug screen performed on Father in October 2015 showed that Father tested positive for marijuana. Father testified without dispute, however, that he had taken a drug screen the day of trial, which had come back "clean."

Father testified that he was currently incarcerated with an anticipated release date of March 2017. Father stated, however, that he hoped to be released earlier if he is approved for drug court. According to Father, he was arrested in January 2016 on three theft charges, as well as thirteen fraudulent use of a credit card charges. Father had no criminal history prior to January 2016. Father also admitted that the credit card belonged to his sister. Eventually, Father pleaded guilty to these charges and was sentenced to

---

[3] The petition also sought the termination of Mother's parental rights to the children, as well as the termination of parental rights of half-sister's father. The trial court terminated Mother's and the half-sister's father's parental rights, but they have not appealed.

[4] By "BUP" we assume that Father tested positive for buprenorphine, "a synthetic opioid agonist-antagonist . . . administered . . . for the relief of moderate to severe pain and . . . used . . . to treat opioid dependency." *Mosby's Dictionary of Medicine, Nursing, & Health Professions* 258 (9th ed. 2013).

eleven months, twenty-nine days incarceration, suspended to forty-five days. Father testified that he was released from jail in late February, only to return to jail in April for failure to pay child support. Father testified, however, that he was immediately released from incarceration after making a purge payment of $100.00, which Father testified represented ten $10.00 monthly payments based upon a previous child support order. In April, Father returned to jail for approximately fifteen days for a violation of probation. Father again returned to jail in June 2016, where he remained at the time of trial.

Father next testified regarding his efforts to pay support, establish a home, and meet his obligations under the permanency plans. Father acknowledged that he was aware of his requirements under the permanency plans. According to Father, he attempted to meet those requirements when he was not incarcerated. Father testified that prior to January 2016, he was employed at several different locations, but that he never had difficulty finding a job. According to Father, he used his income for rent, food, gas, and hygiene; the little money that was left over went toward attempting to find suitable housing and sometimes cigarettes. Father testified that prior to his current incarceration, he was attempting to get a job in roofing to maintain a more stable income for the child. Father testified that he put in two applications for housing but that he never heard back. As such, Father testified that he moved around considerably following the removal of the children. Father admitted that DCS was unable to perform a home study on at least one of the residences because he "never followed up with that." The instability of Father's housing had been ameliorated, however, according to Father, as he testified that he and the child would live in a home provided by his father upon his release from incarceration.

Father also testified that, although he did complete both a mental health and an alcohol and drug assessment, he had been unable to complete the recommendations of either. Specifically, Father testified that he could not complete the requirements of the alcohol and drug assessment because he was incarcerated. With regard to the mental health assessment, Father testified that he refused the recommendation to be placed on medication management because he had witnessed others go through withdrawal after taking similar drugs. Father testified, however, that he would participate in counseling regarding his pain management.

Katharyn Way, the child's DCS caseworker, testified regarding her involvement in the case. Ms. Way had been involved with the case since the summer of 2015. According to Ms. Way, the children were removed from the home due to drug use by several adults in the home, the lack of utilities in the home, and questions regarding malnourishment of the child's half-sister. Ms. Way testified regarding Father's visits with the child. In general, Father made an effort to visit with the child prior to becoming incarcerated in January 2016.

- 4 -

Ms. Way testified that she attempted to help Father obtain stable housing by giving Father a brochure of possible housing options and providing a letter for Father to attach to his housing applications. In addition, Ms. Way testified that she informed Father that DCS would help with rental payments once housing was secured. Because Father never provided proof to DCS that he had secured housing, however, this service was never used. Instead, Ms. Way testified that Mother and Father often informed her that they were moving or had recently moved. Often, the addresses provided to Ms. Way were inaccurate. As a result, Ms. Way was unable to perform a home study on any home that Father allegedly resided in. Ms. Way also testified that she had difficulty contacting Father, who had given her as many as eight different telephone numbers during her tenure on the case.

Ms. Way testified that DCS developed three permanency plans for Father. After giving Father six months on each plan with Father making little to no progress, DCS decided to go forward with termination. Indeed, Ms. Way testified that Father's living situation was worse at the time of trial than when the children were originally taken, as Father was now incarcerated.

Foster Mother testified that the child and half-sister have been residing in the home since July 28, 2015.[5] According to Foster Mother, the child is doing well in the home. Although the child suffers from anxiety in large groups, Foster Mother testified that the child has bonded with the church family where her husband is a pastor. The child refers to Foster Mother and her husband as mommy and daddy. According to Foster Mother, the child has never asked about Father. Foster Mother further testified that it is her and her husband's desire to have the children become permanent members of their home, either as legal guardians or by becoming approved to adopt the children.

The trial court entered an order terminating Father's parental rights to the child. The trial court first noted that DCS conceded that they could not prove willful failure to visit at trial. The trial court concluded, however, that clear and convincing evidence of abandonment by an incarcerated parent through wanton disregard was established, as Father had engaged in drug use and criminal activity throughout the child's life, leading him to be incarcerated. Next, the trial court concluded that DCS had shown that Father failed to establish a suitable home for the child, given DCS's evidence about the efforts its agents expended in helping Father to find a home and Father's admissions that rather than find a home, he engaged in further criminal activity and failed to keep in touch with DCS concerning his living arrangements. The trial court also concluded that the ground of substantial non-compliance with a permanency plan had been met, as Father failed to obtain stable housing or employment and failed to follow the recommendations resulting from his mental health and alcohol and drug assessments. In addition, the trial court

---

[5] Foster Mother testified that she also provided temporary care for the child and half-sister for five days at the end of June 2015, but that the children did not begin to continuously reside in her home until late July.

concluded that DCS had proven the ground of persistent conditions, in that Father had failed to remedy the lack of suitable home that led to the child's removal and appears to have made little progress toward achieving the stability necessary to return the child to him. The trial court also found that Father failed to pay any support in the period of time from September 6, 2015, to January 6, 2016. Although the trial court noted that Father made a $100.00 payment in April 2016, the trial court determined that this payment was token. Finally, the trial court ruled that the termination of Father's parental rights was in the child's best interest. Father now appeals.

## Issues Presented

Father presents five issues for our review, which are taken from his brief and reordered:

1. Was the evidence presented at trial sufficient to meet the clear and convincing standard that the termination was appropriate based upon the ground of abandonment by failure to provide a suitable home.
2. Was the evidence presented at trial sufficient to meet the clear and convincing standard that the termination was appropriate based upon the ground of abandonment by incarcerated parent by wanton disregard.
3. Was the evidence presented at trial sufficient to meet the clear and convincing standard that the termination was appropriate based upon the ground of abandonment by incarcerated parent for failure to support.
4. Was the evidence presented at trial sufficient to meet the clear and convincing standard that the termination was appropriate based upon the ground of substantial noncompliance with the permanency plan.
5. Was the evidence presented at trial sufficient to meet the clear and convincing standard that the termination was appropriate based upon the ground of persistent conditions.
6. Was the evidence presented at trial sufficient to meet the clear and convincing standard that the termination was in the best interest of the child.

## Analysis

According to the Tennessee Supreme Court:

A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions. *Troxel v. Granville*, 530 U.S. 57, 65 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female child*, 896 S.W.2d 546, 547–48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578–79 (Tenn. 1993). But parental rights, although

- 6 -

fundamental and constitutionally protected, are not absolute. ***In re Angela E.***, 303 S.W.3d at 250. "'[T]he [S]tate as parens patriae has a special duty to protect minors . . . .' Tennessee law, thus, upholds the [S]tate's authority as parens patriae when interference with parenting is necessary to prevent serious harm to a child." ***Hawk***, 855 S.W.2d at 580 (quoting ***In re Hamilton***, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also* ***Santosky v. Kramer***, 455 U.S. 745, 747 (1982); ***In re Angela E.***, 303 S.W.3d at 250.

***In re Carrington H.***, 483 S.W.3d 507, 522–23 (Tenn. 2016) (footnote omitted).

Our termination statutes identify "those situations in which the state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought." ***In re Jacobe M.J.***, 434 S.W.3d 565, 568 (Tenn. Ct. App. 2013) (quoting ***In re W.B.***, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. Apr. 29, 2005)). A person seeking to terminate parental rights must prove both the existence of one of the statutory grounds for termination and that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c); ***In re D.L.B.***, 118 S.W.3d 360, 367 (Tenn. 2003); ***In re Valentine***, 79 S.W.3d 539, 546 (Tenn. 2002).

Because of the fundamental nature of the parent's rights and the grave consequences of the termination of those rights, courts must require a higher standard of proof in deciding termination cases. ***Santosky***, 455 U.S. at 769. Consequently, both the grounds for termination and the best interest inquiry must be established by clear and convincing evidence. Tenn. Code Ann. § 36-3-113(c)(1); ***In re Valentine***, 79 S.W.3d at 546. Clear and convincing evidence "establishes that the truth of the facts asserted is highly probable . . . and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence." ***In re M.J.B.***, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004). Such evidence "produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established." ***Id.*** at 653.

As our supreme court opined:

The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. ***In re M.L.P.***, 281 S.W.3d [387,] 393 [(Tenn. Ct. App. 2009)] (quoting ***In re Adoption of A.M.H.***, 215 S.W.3d [793], 810 [(Tenn. 2007)]). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. ***In re Angela E.***, 303 S.W.3d at 246.

***Carrington H.***, 2016 WL 819593, at *12.

When the resolution of an issue in a case depends upon the truthfulness of witnesses, the trial judge, who has had the opportunity to observe the witnesses and their manner and demeanor while testifying, is in a far better position than this Court to decide those issues. *See **McCaleb v. Saturn Corp.***, 910 S.W.2d 412, 415 (Tenn. 1995); ***Whitaker v. Whitaker***, 957 S.W.2d 834, 837 (Tenn. Ct. App. 1997). The weight, faith, and credit to be given to any witness's testimony lies in the first instance with the trier of fact, and the credibility accorded will be given great weight by the appellate court. ***Walton v. Young***, 950 S.W.2d 956, 959 (Tenn. 1997).

Accordingly, we must determine whether clear and convincing evidence in the record supports the grounds for termination found by the trial court. We begin first with abandonment.

## Grounds for Termination
### Abandonment Generally

Tennessee Code Annotated section 36-1-113(g)(1) provides that abandonment may constitute a ground for termination. In turn, Tennessee Code Annotated section 36-1-102(1)(A) provides various situations wherein abandonment may be found. Here, DCS pursued three types of abandonment against Father: (1) abandonment by failure to establish a suitable home; (2) abandonment by an incarcerated parent for wanton disregard; and (3) abandonment by an incarcerated parent for willful failure to pay support. We will first consider whether the ground of abandonment by failure to establish a suitable home was proven by clear and convincing evidence.

### I.

According to section 36-1-102(1)(A):

For purposes of terminating the parental or guardian rights of a parent or parents or a guardian or guardians of a child to that child in order to make that child available for adoption, "abandonment" means that:

\* \* \*

(ii) The child has been removed from the home of the parent or parents or the guardian or guardians as the result of a petition filed in the juvenile court in which the child was found to be a dependent and neglected child, as defined in § 37-1-102, and the child was placed in the custody of the department or a licensed child-placing agency, that the juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances

- 8 -

of the child's situation prevented reasonable efforts from being made prior to the child's removal; and for a period of four (4) months following the removal, the department or agency has made reasonable efforts to assist the parent or parents or the guardian or guardians to establish a suitable home for the child, but that the parent or parents or the guardian or guardians have made no reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a parent or guardian in establishing a suitable home for the child may be found to be reasonable if such efforts exceed the efforts of the parent or guardian toward the same goal, when the parent or guardian is aware that the child is in the custody of the department; . . . .

A suitable home "requires more than a proper physical living location." *In re Hannah H.*, No. E2013-01211-COA-R3-PT, 2014 WL 2587397, at *9 (Tenn. Ct. App. June 10, 2014) (quoting *State v. C.W.*, No. E2007-00561-COA-R3-PT, 2007 WL 4207941, at *3 (Tenn. Ct. App. Nov. 29, 2007)). "It requires that the home be free of drugs and domestic violence." *Id.*

Here, the trial court found that the child was removed from Father's home in May 2015 due to malnutrition, lack of utilities, and drug use. Thereafter, the children were adjudicated dependent and neglected. The trial court further noted that DCS had attempted to assist Father in providing a suitable home in the four months following the child's removal. Despite this help, the trial court found that Father had made little effort to establish a suitable home for himself and his child. Rather, he moved several times, providing inaccurate addresses to DCS on a number of occasions, all the while "living the lifestyle of a criminal" by using illegal drugs and engaging in criminal activity. Given that Father remained incarcerated at the time of trial, the trial court concluded that DCS established that Father failed to establish a suitable home.

Nothing in the record preponderates against the trial court's findings of fact with regard to this ground. The record shows that the children were removed from Father's home and adjudicated dependent and neglected as required by section 36-1-102(1)(A)(ii). Additionally, Father's DCS caseworker, Ms. Way, testified that in the four months following the removal of the child, she drafted a letter for Father to use in applying for housing, as well as provided Father a resource guide for finding appropriate housing. According to the Ms. Way, Father would often state that he had stable housing but failed to disclose an accurate address where he was living, so no home study was ever able to be accomplished. Additionally, Ms. Way informed Father that DCS could help with rental payments once housing was secured. Because Father never provided any proof to DCS that he had secured housing beyond his multiple unsubstantiated claims, however, this assistance was never utilized. The evidence therefore does not preponderate against the

trial court's finding that DCS expended reasonable efforts in the four months following the child's removal. Despite these efforts, the record is clear that Father has not established a home for the child; instead, he continued to engage in criminal behavior and drug use, leading him to be incarcerated at the time of trial. Even prior to Father's current incarceration, he made little effort to establish a suitable home; instead, as Ms. Way's testimony shows, Father moved frequently and failed to provide DCS with accurate addresses so that home studies could be conducted.

In his brief, however, Father asserts that he undertook various efforts to establish a suitable home, including seeking better employment and putting applications in to various housing locations. Even taking this evidence as true, however, Father cannot deny that he continued to engage in criminal activity and drug use that prevented him and continues to prevent him from establishing a home for the child. Indeed, this Court has previously held that "[i]n parental rights matters, the court does not look to the protestations of affections and expressed intentions of the parent, but rather the parent's course of conduct." *State, Dep't of Children's Servs. v. J.M.F.*, No. E2003-03081-COA-R3-PT, 2005 WL 94465, at *7 (Tenn. Ct. App. Jan. 11, 2005). Here, the evidence concerning Father's intentions therefore does not outweigh the evidence concerning Father's conduct after the removal of the children, which illustrates that he made no reasonable effort toward establishing a suitable home for his child. The record therefore contains clear and convincing evidence to support this ground for termination. Consequently, the trial court's determination with regard to this ground is affirmed.

## II.

Tennessee Code Annotated section 36-1-102(a)(iv) provides additional mechanisms by which abandonment may be proven when the parent is incarcerated at or shortly before the filing of the termination petition. Section 36-1-102(a)(iv) provides that abandonment may be shown by proving that:

> A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and either has willfully failed to visit or has willfully failed to support or has willfully failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's or guardian's incarceration, or the parent or guardian has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child. . . .

As stated by this Court in *In re Audrey S.*, 182 S.W.3d 838 (Tenn. Ct. App. 2005):

> The General Assembly's decision to provide two additional tests for abandonment for incarcerated or recently incarcerated parents reflects, in

part, the difficulties inherent in proving that a parent has willfully failed to visit or support a child for four consecutive months when the parent was incarcerated during all or part of that time. Incarceration necessarily restricts a prisoner's freedom of movement, and many prisoners have no resources with which to continue paying child support once their crimes and resulting imprisonment have forced them to forfeit their regular jobs. Thus, the parent's incarceration provides a ready-made excuse for his or her failure to visit or support the child during the four-month period made relevant by the first statutory definition of abandonment. However, the strong public interest in providing procedures for terminating the parental rights of unfit parents does not dissipate simply because a parent's irresponsible conduct has reached the level of criminal behavior and incarceration.

\* \* \*

Tenn. Code Ann. § 36-1-102(1)(A)(iv) also reflects the commonsense notion that parental incarceration is a strong indicator that there may be problems in the home that threaten the welfare of the child. Incarceration severely compromises a parent's ability to perform his or her parental duties. A parent's decision to engage in conduct that carries with it the risk of incarceration is itself indicative that the parent may not be fit to care for the child. [James G. Dwyer,] *Taxonomy of Children's Rights*, 11 Wm. & Mary Bill Rts. J. [845,] at 958 [(2003)]. However, parental incarceration is not an infallible predictor of parental unfitness.

*Id.* at 865–66 (footnotes omitted).

Here, Father does not dispute that he was incarcerated at or in the four months preceding the filing of the termination petition. Rather, Father argues that clear and convincing evidence has not been shown to support either wanton disregard or willful failure to support under this definition. We begin with wanton disregard.

**A.**

With regard to the ground of abandonment by an incarcerated parent through wanton disregard, this Court has explained:

Incarceration alone is not conclusive evidence of wanton conduct prior to incarceration. *In re Audrey S.*, 182 S.W.3d 838, 866 (Tenn. Ct. App. 2005). Rather, "incarceration serves only as a triggering mechanism that allows the court to take a closer look at the child's situation to determine whether the parental behavior that resulted in incarceration is part of a broader pattern of conduct that renders the parent unfit or poses a risk of substantial harm to the welfare of the child." Id. The statutory

- 11 -

language governing abandonment due to a parent's wanton disregard for the welfare of a child "reflects the commonsense notion that parental incarceration is a strong indicator that there may be problems in the home that threaten the welfare of the child" and recognizes that a "parent's decision to engage in conduct that carries with it the risk of incarceration is itself indicative that the parent may not be fit to care for the child." *Id.*

Numerous cases have held that a parent's previous criminal conduct, coupled with a history of drug abuse, constitutes a wanton disregard for the welfare of the child. *See, e.g.*, **State v. J.M.F.**, No. E2003-03081-COA-R3-PT, 2005 WL 94465, at *8 (Tenn. Ct. App. Jan. 11, 2005); **In re C. LaC**., No. M2003-02164-COA-R3-PT, 2004 WL 533937, at *7 (Tenn. Ct. App. Mar. 17, 2004); **State v. Wiley**, No. 03A01-9903-JV-00091, 1999 WL 1068726, at *7 (Tenn. Ct. App. Nov. 24, 1999); **In the Matter of Shipley**, No. 03A01-9611-JV-00369, 1997 WL 596281, at *5 (Tenn. Ct. App. Sept. 29, 1997).

**In re C.A.H.**, No. M2009-00769-COA-R3-PT, 2009 WL 5064953, at *5 (Tenn. Ct. App. Dec. 22, 2009).

Here, the trial court found that Father had engaged in illegal drug use as a late as August 2015. In addition, the trial court noted that Father had been arrested multiple times in 2016, for crimes ranging from theft, driving violations, escape from incarceration, and thirteen counts of fraudulent use of a credit card. The trial court therefore concluded that the ground of wanton disregard had been shown by clear and convincing evidence. Father argues, however, that his criminal record does not extend to years prior to the children's removal and his clean drug screen at trial illustrate that he did not exhibit wanton disregard for the child sufficient to support this ground for termination.

Respectfully, we cannot agree. "[P]robation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child can, alone or in combination, constitute conduct that exhibits a wanton disregard for the welfare of a child." **In re Audrey S.**, 182 S.W.3d at 867–68. Here, Father admitted to multiple arrests since the children were removed. Indeed, at the time of trial, Father was currently incarcerated due to a violation of his probation, driving on a suspended license, and escape. Although Father's criminal history is not lengthy, he appears to have engaged in a multitude of criminal activity in just a short period of time. Moreover, all of Father's charges occurred after the child was removed, when Father was supposed to be working toward reunification. Rather than making effort in this regard, Father chose to engage in theft and then could not abide by the conditions of his release, leading to his current incarceration. Father was well aware of what was required of him to reunify with the child; instead, he chose to engage in criminal conduct that pushed that reunification date even further into the future with little regard for what that separation meant for the child.

Additionally, Father's clean drug screen at trial is of little relevance, as he was incarcerated at the time the drug screen was performed and admitted to using illegal drugs well after the removal of the children. Indeed, the record shows that DCS had previously been involved with the family due to drug use, but that Father and those living in the home soon returned to using drugs after DCS was no longer involved with the family. Father's decision to use drugs when it was the very reason for DCS's repeated involvement in the case shows that he had little regard to whether the drug use was likely to impact his child. Under these circumstances, we conclude that clear and convincing evidence in the record supports the ground of abandonment by wanton disregard.

**B.**

DCS also alleged that Father willfully failed to support the child under section 36-1-102(1)(A)(iv). As previously discussed, section 36-1-102(1)(A)(iv) provides that abandonment may be proven by showing that the parent "has willfully failed to support or has willfully failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's or guardian's incarceration." Accordingly, this Court must first determine the appropriate four-month period in which we must judge Father's efforts to support the child.

As is evident in this case, the determination of the proper four-month period is complicated by the fact that Father was in and out of jail in the months prior to the filing of the termination petition. The trial court in this case therefore utilized the first consecutive four month period prior to Father's initial incarceration or September 6, 2015 to January 6, 2016. In 2016, however, the Tennessee General Assembly amended Tennessee Code Annotated section 36-1-102 to provide a different method of calculating the four-month period for purposes of determining willful failure to visit or support for an incarcerated parent. As Tennessee Code Annotated section 36-1-102(a)(iv) now explains:

> If the four-month period immediately preceding the institution of the action or the four-month period immediately preceding such parent's incarceration is interrupted by a period or periods of incarceration, and there are not four (4) consecutive months without incarceration immediately preceding either event, a four-month period shall be created by aggregating the shorter periods of nonincarceration beginning with the most recent period of nonincarceration prior to commencement of the action and moving back in time. Periods of incarceration of less than seven (7) days duration shall be counted as periods of nonincarceration. Periods of incarceration not discovered by the petitioner and concealed, denied, or forgotten by the parent shall also be counted as periods of nonincarceration. A finding that the parent has abandoned the child for a defined period in excess of four (4) months that would necessarily include the four (4) months of

nonincarceration immediately prior to the institution of the action, but which does not precisely define the relevant four-month period, shall be sufficient to establish abandonment; . . . .

Tenn. Code Ann. § 36-1-102(a)(iv), effective July 1, 2016. Because this amendment was applicable at the time of the final hearing on this cause, we believe it should have been applied in this case. Accordingly, rather than look to the first consecutive four-month period in which Father was not incarcerated, the trial court was required to determine the four-month period by piecing together Father's periods of non-incarceration prior to the filing of the termination petition. In failing to utilize this calculation, it therefore appears that the trial court utilized an inappropriate four-month period.

This Court has indicated that where the grounds of abandonment by an incarcerated parent for willful failure to support is properly alleged in the termination petition, but the trial court relied on the wrong four-month period, the "omission . . . require[s] us to [vacate and] remand for findings on that issue." *In re Abbigail C.*, No. E2015-00964-COA-R3-PT, 2015 WL 6164956, at \*14 (Tenn. Ct. App. Oct. 21, 2015). Accordingly, we must vacate the trial court's determination with regard to these grounds. *State v. McBee*, No. M2003-01326-COA-R3-PT, 2004 WL 239759, at \*6 (Tenn. Ct. App. 2004) (noting that when a trial court fails to make findings of fact on an issue "we cannot simply review the record de novo and determine for ourselves where the preponderance of the evidence lies"). As discussed throughout this Opinion, however, other grounds exist to terminate Father's parental rights. In addition, as discussed, *infra*, we have affirmed the trial court's determination that termination is in the child's best interest. Thus, a determination that clear and convincing evidence exists to support the grounds of abandonment by an incarcerated parent through failure to visit and support is not necessary to uphold the termination of Father's parental rights. Under these circumstances, remanding for reconsideration of these grounds would only further prolong these proceedings without altering the outcome. Accordingly, we decline to remand this issue to the trial court for reconsideration. *See In re Abbigail C.*, No. E2015-00964-COA-R3-PT, 2015 WL 6164956, at \*10 (Tenn. Ct. App. Oct. 21, 2015) (vacating but not remanding under similar circumstances).

### Substantial Non-Compliance with Permanency Plans

DCS also alleged that a ground for termination existed under Tennessee Code Annotated section 36-1-113(g)(2), which provides a ground for termination where "[t]here has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan pursuant to the provisions of title 37, chapter 2, part 4[.]" Further, Tennessee Code Annotated section 37-2-403 provides, in relevant part:

Substantial noncompliance by the parent with the statement of responsibilities provides grounds for the termination of parental rights, notwithstanding other statutory provisions for termination of parental

rights, and notwithstanding the failure of the parent to sign or to agree to such statement if the court finds the parent was informed of its contents, and that the requirements of the statement are reasonable and are related to remedying the conditions that necessitate foster care placement.

The determination of whether there has been substantial noncompliance with a permanency plan is a question of law, to be reviewed on appeal de novo with no presumption of correctness. *In re Valentine*, 79 S.W.3d 539, 548 (Tenn. 2002). Termination of parental rights under Tennessee Code Annotated section 36-1-113(g)(2) "requires more proof than that a parent has not complied with every jot and tittle of the permanency plan." *In re M.J.B.*, 140 S.W.3d 643, 656 (Tenn. Ct. App. 2004). To succeed under section 36-1-113(g)(2), DCS "must demonstrate first that the requirements of the permanency plan are reasonable and related to remedying the conditions that caused the child to be removed from the parent's custody in the first place." *In re M.J.B.*, 140 S.W.3d at 656–57 (citing *In re Valentine*, 79 S.W.3d at 547; *In re L.J.C.*, 124 S.W.3d 609, 621 (Tenn. Ct. App. 2003)). Second, DCS must show that "the parent's noncompliance is substantial in light of the degree of noncompliance and the importance of the particular requirement that has not been met." *In re M.J.B.*, 140 S.W.3d at 657 (citing *In re Valentine*, 79 S.W.3d at 548–49; *In re Z.J.S.*, No. M2002-02235-COA-R3-JV, 2003 WL 21266854, at * 12 (Tenn. Ct. App. June 3, 2003)).

The record on appeal contains three permanency plans ratified by the trial court. Each plan contains a statement of responsibilities applicable to Father, which are largely identical across all three plans. Specifically, Father was required to participate in an alcohol and drug assessment and follow recommendations, maintain safe, stable, drug-free housing and provide proof to DCS thereof, to attend parenting classes and provide proof to DCS of completion, to submit to random drug screens and pill counts, have a means of transportation or a plan for transportation, obtain and maintain stable employment and provide proof to DCS, and to participate in a mental health assessment and follow recommendations.

Here, Father does not dispute that he was informed of his requirements under the various permanency plans. Father also does not argue that the requirements of the permanency plans were unreasonable or unrelated to the conditions that caused the child to be removed from the home. Rather, Father argues that he substantially complied with the applicable permanency plans by completing alcohol and drug and mental health assessments, participating in parenting classes, and establishing that he had "ready access to housing." Father also cites the fact that he tested negative for illegal substances on the date of trial.

The trial court agreed that Father had completed drug/alcohol and mental health assessments, as well as parenting classes. The trial court disagreed, however, that these actions constituted compliance with the permanency plans, as Father failed to follow the

recommendations from the assessments, failed to establish a suitable home, and was incarcerated due to criminal activity at the time of trial.

Based on the record before us, the evidence does not preponderate against the trial court's findings of fact with regard to this ground. As previously discussed, Father had not established a suitable home at the time of trial, much less provided DCS with proof of such. Indeed, even taking Father's unsubstantiated testimony that he could secure appropriate housing upon his release from incarceration, there is simply no evidence that Father ever provided documentation to DCS to support his claims. Instead, the record shows that Father often provided inaccurate addresses to DCS, which prevented DCS from performing a home study on Father's various homes throughout the proceedings. Additionally, Father admitted that he abused illegal drugs even after the removal of the child and points to only a single clean drug screen as evidence that he no longer abuses drugs. This drug screen, however, was performed while Father had been incarcerated for several months. Because of Father's incarceration, he was also unable to obtain and maintain stable employment.

While we agree with Father that he did complete parenting classes and assessments, evidence also shows that Father failed to follow the recommendations from the assessments. For example, Father testified that as a result of his mental health assessment, it was recommended that Father be placed on medication. Father flatly refused this advice, in clear violation of his responsibilities under the permanency plans. In addition, Father admitted that he was unable to complete the recommendations from the mental health assessment because he was soon sent back to jail. Under these circumstances, we cannot conclude that the trial court erred in concluding that Father's noncompliance with the permanency plans was substantial.

### Persistence of Conditions

Finally, DCS alleged that Father's parental rights should be terminated based upon persistence of conditions. Persistence of conditions requires the trial court to find, by clear and convincing evidence, that:

> The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
>
> > (A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the  parent(s) or guardian(s), still persist;
> >
> > (B) There is little likelihood that these conditions will be remedied at any early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and

(C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

Tenn. Code Ann. § 36-1-113(g)(3).

"A parent's continued inability to provide fundamental care to a child, even if not willful, . . . constitutes a condition which prevents the safe return of the child to the parent's care." *In re A.R.*, No. W2008-00558-COA-R3-PT, 2008 WL 4613576, at *20 (Tenn. Ct. App. Oct. 13, 2008) (citing *In re T.S. & M.S.*, No. M1999-01286-COA-R3-CV, 2000 WL 964775, at *7 (Tenn. Ct. App. July 13, 2000)). The failure to remedy the conditions which led to the removal need not be willful. *In re T.S. & M.S.*, 2000 WL 964775, at *6 (citing *State Dep't of Human Servs. v. Smith*, 785 S.W.2d 336, 338 (Tenn. 1990)). "Where . . . efforts to provide help to improve the parenting ability, offered over a long period of time, have proved ineffective, the conclusion is that there is little likelihood of such improvement as would allow the safe return of the child to the parent in the near future is justified." *Id.* The purpose behind the "persistence of conditions" ground for terminating parental rights is "to prevent the child's lingering in the uncertain status of foster child if a parent cannot within a reasonable time demonstrate an ability to provide a safe and caring environment for the child." *In re A.R.*, No. W2008-00558-COA-R3-PT, 2008 WL 461675, at *20 (Tenn. Ct. App. Oct. 13, 2008) (quoting *In re D.C.C.*, No. M2007-01094-COA-R3-PT, 2008 WL 588535, at *9 (Tenn. Ct. App. Mar. 3, 2008)).

In this case, it is undisputed that the child was removed from Father's care by an order of dependency and neglect for over six months. *See* Tenn. Code Ann. § 36-1-113(g)(3). As such, the trial court concluded that clear and convincing evidence supported the ground of persistent conditions, noting that Father remained incarcerated due to engaging "in a series of crimes in 2016," did not have stable living arrangements prior to his incarceration, has not paid significant child support for the child, and had not followed the recommendations of his mental health assessment and alcohol drug assessment. Because the trial court concluded that these factors were unlikely to be remedied at an early date and continuing a relationship with Father prevented the child from integrating into a suitable and permanent home, the trial court concluded that the ground of persistence of conditions had been shown by clear and convincing evidence.

Father argues on appeal, however, that the trial court erred in concluding that clear and convincing evidence supports this ground. Specifically, Father again points to his clean drug screen at the time of trial as evidence that there are no longer "drug and alcohol concerns." Father also cites his testimony concerning the stable home he anticipates once he is released from incarceration and his completion of parenting classes.

- 17 -

Again, however, we conclude that clear and convincing evidence supports this ground for termination. First, we cannot agree that Father's single clean drug screen at the time of trial is sufficient to show that he is likely to stop using drugs in the future, as Father was incarcerated at the time of trial and therefore unable to use drugs. Indeed, this Court has previously recognized that the cessation of drug use while a parent is incarcerated is insufficient to show that the parent's drug issues have been put behind him or her. *See **In re Navada N.**,* 498 S.W.3d 579, 606 (Tenn. Ct. App. 2016) ("Although Mother testified that she has not used cocaine since February 26, 2015, this cessation was unquestionably aided by the fact that she became incarcerated the following day and was incarcerated through trial."). Additionally, Father admitted at trial that he had previously attended drug rehabilitation, only to again engage in illegal drugs during the events at issue in this case. Indeed, despite the fact that Father was aware that drug use was a reason that his child was removed from his home, he continued to use illegal drugs even after the removal. Under these circumstances, we cannot say that the concerns regarding Father's drug use have been remedied so as to allow the child to return to the home at this time.

Furthermore, regardless of Father's testimony concerning his anticipated housing upon his release from incarceration, there can be no dispute that Father was unable to provide a home for the child at the time of trial because he remained incarcerated. Indeed, as Ms. Way testified at trial, rather than remedy the conditions that led to the removal of the child, Father's own decision to engage in criminal behavior resulting in his incarceration has made Father's situation even less hospitable for the child. Because of Father's incarceration and ongoing concerns regarding his ability to find a suitable home for the child and to refrain from engaging in further criminal activity or drug use, we cannot conclude that the trial court erred in concluding that the child could not be successfully reintegrated into Father's life at an early date. The trial court's determination regarding persistence of conditions is therefore affirmed.

### Best Interest

When at least one ground for termination of parental rights has been established, the petitioner must then prove by clear and convincing evidence that termination of the parent's rights is in the child's best interest. **White v. Moody**, 171 S.W.3d 187, 192 (Tenn. Ct. App. 1994). When a parent has been found to be unfit (upon establishment of ground(s) for termination of parental rights), the interests of parent and child diverge. **In re Audrey S.**, 182 S.W.3d at 877. The focus shifts to the child's best interest. **Id**. Because not all parental conduct is irredeemable, Tennessee's termination of parental rights statutes recognize the possibility that terminating an unfit parent's parental rights is not always in the child's best interest. **Id**. However, when the interests of the parent and the child conflict, courts are to resolve the conflict in favor of the rights and best interest of the child. Tenn. Code Ann. § 36-1-101(d). Further, "[t]he child's best interest must be viewed from the child's, rather than the parent's, perspective." **Moody**, 171 S.W.3d at 194.

- 18 -

The Tennessee Legislature has codified certain factors that courts should consider in ascertaining the best interest of the child in a termination of parental rights case. These factors include, but are not limited to, the following:

> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

> (2) Whether the parent or guardian has failed to affect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

> (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

> (6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

> (7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

> (8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

> (9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i). This Court has noted that, "this list [of factors] is not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's rights is in the best

interest of a child." *In re M. A. R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). Depending on the circumstances of an individual case, the consideration of a single factor or other facts outside the enumerated, statutory factors may dictate the outcome of the best interest analysis. *In re Audrey S.*, 182 S.W.3d at 877. As explained by this Court:

> Ascertaining a child's best interests does not call for a rote examination of each of Tenn. Code Ann. § 36-1-113(i)'s nine factors and then a determination of whether the sum of the factors tips in favor of or against the parent. The relevancy and weight to be given each factor depends on the unique facts of each case. Thus, depending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis.

*In re Audrey S.*, 182 S .W.3d at 878 (citing *White v. Moody*, 171 S.W.3d at 194).

Here, the trial court found that Father had not made an adjustment of circumstances despite efforts by DCS to assist him and that it was unreasonable to conclude that Father would be able to make such an adjustment in the near future. In addition, the trial court found that the child is well-adapted to his stable, pre-adoptive home. Finally, the trial court found that changing caretakers at this stage would likely have a negative impact on the child.

Father argues, however, that clear and convincing evidence does not illustrate that termination is in the child's best interest, citing again his single negative drug screen taken on the day of trial, his testimony regarding his anticipated housing, and his ability to obtain employment. Respectfully, however, we conclude that clear and convincing evidence supports a determination that termination is in the child's best interest. Based upon the foregoing discussion, it is clear that Father has struggled to make an adjustment of circumstances, conduct, or conditions so as to make it safe and in the child's best interest to be in his care. First, as previously discussed, Father's single negative drug screen while incarcerated is insufficient to show that he has made an adjustment of circumstances that would allow the child to be returned to him. *See* Tenn. Code Ann. § 36-1-113(i)(1). Indeed, Father admitted that DCS had previously been involved with the family due to drug use in the past and that he had previously attended drug rehabilitation, all to no avail, as the children were thereafter removed, in part, due to drug use in the home. Instead of remedying the conditions that led to the child's removal by working to complete his requirements under the permanency plan, Father thereafter chose to engage in criminal conduct that made reunification even less likely. *See* Tenn. Code Ann. § 36-1-113(i)(7).

Father's incarceration provides another barrier to reunification, as it prevents him from providing a safe and stable home for the child, despite DCS's efforts. *See* Tenn. Code Ann. § 36-1-113(i)(2). Indeed, Father's testimony that he will have stable housing upon his release from incarceration is not persuasive, as Father repeatedly made similar

claims to Ms. Way throughout this case, all the while failing to provide any proof that those claims were substantiated. *See* Tenn. Code Ann. § 36-1-113(i)(7).

Although Father does appear to have maintained visitation with the child during the brief periods that he was not incarcerated, see Tenn. Code Ann. § 36-1-113(i)(3), we note that the evidence in the record supports a finding that no meaningful relationship exists between Father and the child. *See* Tenn. Code Ann. § 36-1-113(i)(4). Here, the child was removed from Father's custody when he was not yet two years old. According to Foster Mother, the child has never inquired about Father and refers to herself and her husband as his parents. Given that the child is bonded to Foster Mother and her husband and appears to be thriving in their care, we agree with the trial court that a change in caretakers at this point would have a detrimental effect on the child. *See* Tenn. Code Ann. § 36-1-113(i)(5). Consequently, we agree with the trial court that clear and convincing proof establishes that termination of Father's parental rights is in the child's best interest.

## Conclusion

The judgment of the Jefferson County Juvenile Court is vacated in part and affirmed in part. The termination of Father's parental rights is affirmed. This cause is therefore remanded to the trial court for further proceedings as may be necessary and are consistent with this Opinion. Costs of this appeal are taxed to Appellant, Travis H., for which execution may issue if necessary.

_____
J. STEVEN STAFFORD, JUDGE